UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                     <u>For Online Publication Only</u>
--------------------------------------------------------------------X
MEGHAN WURTZ and MINDY
BURNOVSKI, individually and behalf of all
others similarly situated,

                          Plaintiffs,

        v.-

                                                                   <u>**MEMORANDUM & ORDER**</u>
                                                       12–CV–1182 (JMA) (AKT)

THE RAWLINGS COMPANY, LLC; OXFORD
HEALTH PLANS (NY), INC.; UNITEDHEALTH
GROUP, INCORPORATED,
                                                    **FILED**
                                                  **CLERK**

                         Defendants.
                                            11/17/2016 3:28 pm
--------------------------------------------------------------------X
                                            **U.S. DISTRICT COURT**
AZRACK, United States District Judge:                    **EASTERN DISTRICT OF NEW YORK**
                                            **LONG ISLAND OFFICE**

        Plaintiff Meghan Wurtz brings this putative class action on behalf of herself and all others similarly situated against The Rawlings Company, LLC ("Rawlings"), Oxford Health Plans (NY), Inc. ("Oxford Health"), and UnitedHealth Group, Inc. ("United Health") (collectively, "defendants"). Plaintiff has alleged that New York General Obligations Law § 5-335 ("GOL § 5-335") vitiates defendants' right of subrogation or reimbursement against individuals who have settled claims for personal injuries, medical, dental, or podiatric malpractice, or wrongful death. Plaintiff seeks the following relief: (1) a declaratory judgment that defendants "do not have a right to assert and/or collect on any lien and/or right of subrogation and/or right of reimbursement under fully insured health insurance plans against other plaintiffs and/or claimants that have settled personal injuries, medical, dental, or podiatric malpractice, or wrongful death cases or claims arising and/or pending in New York;" (2) damages based upon defendants' alleged violations of New York General Business Law § 349 ("GBL § 349"); and (3) restitution based upon defendants' allegedly unjust enrichment.

Presently before the Court is defendants' motion for summary judgment on plaintiff's claims for monetary relief and plaintiff's cross-motion for summary judgment on her unjust enrichment claim.[1]  For the reasons that follow, the Court grants defendants' motion and denies plaintiff's cross-motion.

First, the Court rejects plaintiff's argument that the voluntary payment doctrine cannot apply to statutory claims and finds that the doctrine may bar recovery of payments made voluntarily and with full knowledge of the facts, regardless of whether such recovery is sought via statutory or common law claims.  Second, the Court finds that the voluntary payment doctrine bars recovery of plaintiff's payment to defendants.  Third, the Court finds, in the alternative, that defendants are entitled to summary judgment on plaintiff's GBL § 349 claim.

## I.    BACKGROUND

### A.  Factual Background

#### i.  Plaintiff's Personal Injury Suit

Plaintiff was injured in an accident at a CVS pharmacy in April 2008.  (Compl. ¶ 6).  As a result of her injuries, Plaintiff received medical benefits from her Oxford Health Plan in the amount of $1,316.87.  (Id; Wurtz Dep. at 28:14-30:16.)  On May 6, 2008, Plaintiff retained Hach & Rose, LLP ("Hach Rose") to represent her in a personal injury lawsuit against CVS and, on December 9, 2008, plaintiff commenced a personal injury action in New York Supreme Court for New York County against CVS.  (Rabinovitz Dec. Ex. 3; Compl. ¶ 6.)

---

[1]As defendants have acknowledged, the Second Circuit has decided in plaintiff's favor on their claim for a declaratory judgement that GOL § 5-335 invalidates defendants' "right to assert and/or collect on any lien and/or right of subrogation and/or right of reimbursement under fully insured health insurance plans against other plaintiffs and/or claimants that have settled personal injuries, medical, dental, or podiatric malpractice, or wrongful death cases or claims arising and/or pending in New York." (Defs'. Br. 1, fn. 2; Wurtz v. Rawlings Co., LLC, 761 F.3d 232 (2d Cir. 2014).)  As such, the only claims before the court are those for monetary relief.

In August 2011 plaintiff terminated her insurance coverage with Oxford Health because she moved to her husband's insurance plan. (Wurtz Dep. 32:9-18.) On October 28, 2011, plaintiff and CVS reached a settlement agreement, and CVS paid $35,000 jointly to plaintiff and Hach Rose. (Rabinovitz Dec. Ex. 4.)

### ii. Defendants' Claim for Reimbursement

On October 28, 2011—the day that plaintiff settled her claim with CVS—a representative of Hach Rose made a telephone call to a representative of Rawlings to inquire about the status of Oxford Health's reimbursement claim against plaintiff. (Stout Dec. ¶ 3.) Rawlings was Oxford Health's agent for purposes of the claim. (Compl. ¶ 6.) On that same day, Rawlings sent two letters to Hach Rose concerning Oxford Health's claim.[2] (Rabinovitz Dec. Ex. 6.) Those letters, and the documents enclosed therein, form the basis for plaintiff's allegation that defendants made misleading or deceptive statements.

In one of the letters, defendants stated that Oxford Health "has a claim/lien for medical benefits paid on behalf of" plaintiff for $1,316.87. (Id.) The letter further stated that there "are differing legal viewpoints regarding the application of New York law to" Oxford Health's claim but also stated that, "[p]er current federal law, [Oxford Health's] recovery rights will preempt application of" GOL § 5-335 such that the claim would not be barred. (Id.)

In the other letter, defendants restated Oxford Health's reimbursement claim and attached summaries of the underlying expenses, as well as a "Position Statement" dated November 2009. (Id.) The "Position Statement" describes the test for exceptions to the general rule that ERISA preempts state law and notes that there "are currently no reported cases" applying that test to New

---

[2] It is undisputed that the only direct contact between plaintiff and defendants concerning Oxford Health's reimbursement claim consisted of a "routine accident questionnaire" sent directly to plaintiff on June 23, 2008, before defendants learned that plaintiff had retained counsel. All communication between the parties concerning the reimbursement claim went through plaintiff's counsel. (Wurtz Dep. 49:18-22; 80:16-19).

York GOL § 5-335.  (Id.)  The "Position Statement" then goes on to argue that GOL § 5-335 "is not sufficient" to satisfy the test and, therefore, will be preempted by ERISA.  (Id.)  The "Position Statement" concludes by stating that Rawlings was "not prepared to waive" the reimbursement claim but was "willing to negotiate an amicable settlement" of that claim.  (Id.)

On November 18, 2011, a representative of Hach Rose wrote to Rawlings to request "the current and final amount of the lien Rawlings is asserting on behalf of Oxford" and, on November 29, 2011, a representative of Rawlings responded, stating that "[t]he final amount of our client's claim is $1,316.87."  (Rabinovitz Dec. Exs. 2, 7.)

On December 19, 2011—prior to making any payment to defendants—plaintiff received a retainer letter from Hach Rose Schirripa & Cheverie LLP ("HRSC")[3] that described an agreement under which HRSC would represent plaintiff in the lawsuit that is currently before the Court.  In relevant part, the letter stated: "This letter will serve to confirm that, on or about December 19, 2011, you retained Hach Rose Schirripa & Cheverie LLP…to represent you…in connection with a potential class action seeking to recover damages caused to a proposed class of individuals who unknowingly have paid monies to health insurance providers and/or their agents pursuant to ERISA plans in violation of New York State General Obligation Law § 5-335."  (Rabinovitz Dec. Ex. 8.)  The plaintiff did not sign the engagement letter until January 31, 2012.  (Id.; Wurtz. Dep. 65:25 – 66:7.)  The parties dispute the date on which plaintiff agreed to the terms of the engagement letter and, at one point in her deposition, plaintiff stated: "I don't agree to anything until it is signed. I mean signature is everything."  (Wurtz Dep. 66:5-7.)

At a number of other times during her deposition, however, plaintiff indicated that she had "reached a verbal agreement" with Hach Rose and/or HRSC at least as early as December 19, 2011.

---

[3] While HRSC is a separate entity from Hach Rose, it appears to consist of many of the same attorneys.

(Wurtz Dep. 66:15-25).  When asked when she began "considering a class action lawsuit," plaintiff responded: "November, December of 2011."  (Wurtz Dep. 47:2-4).  Plaintiff was also asked: "On December 19, 2011 is it fair to say you agreed with the Hach & Rose firm to prosecute a class action lawsuit against Rawlings and Oxford?" and responded: "Yes."  (Wurtz Dep. 55:3-7).  When asked about the gap between receiving and signing the letter, plaintiff made no mention of not yet having agreed to the terms; instead, she responded only that she "may have been travelling . . . for business."  (Wurtz Dep. 57:21-58:3).

On January 10, 2012—after plaintiff had received the engagement letter from HRSC, but before she had executed it—Hach Rose sent Rawlings a check for $1,316.87 with the notation "WURTZ, Meghan: Lien Payment in Full."  (Rabinovitz Dec. Ex. 9).  The parties dispute both the extent to which plaintiff relied on the representations made by Rawlings and the extent to which she discussed her decision with her attorneys.

The record establishes that, at the time she made the payment, plaintiff understood that there were "differing legal viewpoints regarding whether New York law required [her] to pay the lien or not" and that the state of the law was "wasn't clear at the time."  (Wurtz Dep. 69:4-10; 83:17-22).  All relevant communications concerning Oxford Health's claim were between plaintiff's attorneys and defendants; plaintiff herself had no contact with defendants.  (Id. 49:18-22; 80:16-19).  Plaintiff conceded that defendants did not threaten to "take away [her] insurance," did not threaten to report [her] to credit agencies," and did not make "any threats . . . of consequence" in order to induce her to pay.  (Id. 67:2-19).  Finally, plaintiff testified that she discussed Oxford Health's reimbursement claim and the law governing that claim with her counsel prior to making the payment.  (Id. 54:2-20.)

**B. Procedural Posture**

On February 2, 2012, plaintiff and Mindy Burnovski—a former co-plaintiff whose claims have been dismissed—filed a class action complaint in New York State Supreme Court for the County of Nassau.  (Dkt. 1.)  Defendants removed the action to the Eastern District of New York on March 9, 2012, and moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkts. 1, 15.)  On March 28, 2013, the Honorable Joseph F. Bianco granted defendants' motion to dismiss, finding that plaintiffs' claims for violation of GOL § 5-335 were preempted by the terms of their ERISA plans.[4]  (Dkt. 27.)

Plaintiffs appealed dismissal of their claims.  On July 31, 2014, the Second Circuit vacated Judge Bianco's decision and remanded the case, finding that ERISA did not preempt GOL § 5-335.  Wurtz v. Rawlings Co., LLC, 761 F.3d 232 (2d Cir. 2014).  On remand, Judge Bianco granted defendants' motion to dismiss Burnovski's claims.  (Dkt. 40.)  Although Judge Bianco granted Burnovski leave to replead her claims on or before November 3, 2014, she failed to do so and has no claims pending before the Court.

The parties subsequently conducted discovery and, on July 17, 2015, defendants notified the court of their intention to move for summary judgment.  (Dkt. 65.)  The instant summary judgment motions were fully briefed on March 3, 2016.  (Dkts. 81-95.)  Plaintiff subsequently filed a supplemental letter in April 2016, arguing for the first time that the voluntary payment doctrine did not apply because her payment had been made under duress and urging the Court to follow a case in the District of New Jersey that had been decided after the parties' motions were briefed.  (Dkt. 96.)  Shortly thereafter, defendants submitted a letter in opposition.  (Dk. 97.)

---

[4] This matter was originally assigned to the Honorable Arthur D. Spatt, but he recused himself on December 26, 2012, and the case was then assigned to the Honorable Joseph F. Bianco.  (Dkt. 22.)  On January 16, 2015, the case was reassigned to the undersigned.

## II.    DISCUSSION

### A.  Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]"[5] Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).  To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586 (citations omitted).  Mere conclusory allegations,

---

[5]  As explained below, the Court is granting defendants' motion.  Thus, it is not necessary to consider plaintiff's cross-motion for summary judgment on her unjust enrichment claim.  Accordingly, the Court has analyzed all of the evidence in the light most favorable to plaintiff.

speculation, or conjecture will not avail a party resisting summary judgment.  See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).  Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate.  Anderson, 477 U.S. at 249.

**B.  State Law to Be Applied**

When sitting in diversity jurisdiction and reviewing New York state law claims, a federal court must apply "the law of New York as interpreted by the New York Court of Appeals."  Lehman XS Trust, Series 2006-4N, ex rel. U.S. Bank Nat. Ass'n v. Greenpoint Mortg. Funding, Inc., 643 F. App'x 14, 16 (2d Cir. 2016) (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 48 (2d Cir. 2013)).  Where the Court of Appeals has not ruled on an issue, federal courts are "obliged to follow the state law decisions of state intermediate appellate courts" unless there is "persuasive data that the highest court of the state would decide otherwise."  Pentech Intern., Inc. v. Wall Street Clearing Co., 983 F.2d 441, 445-46; see also West v. Am. Tel. & Tel. Co., 311 U.S. 223 (1940); Broder v. Cablevision Systems Corp., 418 F.3d 187 (2d Cir. 2005).

When confronting "an apparent split in authority among the Appellate Divisions," a federal court must "predict how the [Court of Appeals] would resolve" the ambiguity.  Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000).  Federal courts cannot simply accept the interpretation of the Appellate Division that would apply in the state court where the suit was brought prior to removal.  Id.

**C.  The Voluntary Payment Doctrine**

For the reasons set out below, the Court finds that the voluntary payment doctrine bars recovery of plaintiff's payments.  As such, defendants are entitled to summary judgement on plaintiff's claims for monetary relief.

### i. Elements of the Voluntary Payment Doctrine

Under New York common law, the voluntary payment doctrine "bars recovery of payments made with full knowledge of the facts, even if made under a mistake of law." Dillon v. U-A Columbia Cablevision of Westchester, 292 A.D.2d 25, 27 (App. Div. 2d Dep't 2002); see also Spagnola v. Chubb Corp., 574 F.3d 64 (2d Cir. 2009); Gimbel Bros. v. Brook Shopping Ctrs., 118 A.D.2d 532 (App. Div. 2d Dep't 1986). The voluntary payment doctrine stems from the policy that, "[w]hen a party intends to resort to litigation in order to resist paying an unjust demand, that party should take its position at the time of the demand and litigate the issue before, rather than after, payment is made." Dillon, 292 A.D.2d at 28; see also Gimbel Bros. 118 A.D.2d at 535 (barring recovery where the payment was made "voluntarily, as a matter of convenience").

As its name suggests, the voluntary payment doctrine applies only to voluntary payments, not to payments made as a result of fraud or duress. See DRMAK Realty LLC et al. v. Progressive Credit Union, 133 A.D.3d 401, 405 (App. Div. 1st Dep't 2015) (noting that the doctrine would not apply where the plaintiff had been "deprived of any economic choice"); see also People v. Dioguardi, 8 N.Y.2d 260, 276 (N.Y. 1960) (in order for a payment to be rendered involuntary, there must be "some actual or threatened exercise of power…[such that the plaintiff] has no other means of immediate relief than by making the payment"); Kilpatrick v. Germania Life Ins. Co., 183 N.Y. 163 (N.Y. 1905) (same); Negrin v. Norwest Mortg. Inc., 263 A.D.2d 39, 50 (App. Div. 2d Dep't 1999) (voluntary payment doctrine does not bar recovery in a situation where "the only sane thing to do" was make the payment).

New York has modified the voluntary payment doctrine by statute, giving courts the discretion to allow recovery in situations where a payment was made under mistake of law. See

N.Y. C.P.L.R. 3005 ("When relief against a mistake is sought in an action…relief shall not be denied merely because the mistake is one of law rather than one of fact.").  This statutory modification "does not require that mistakes of law shall be treated in all instances as though they were mistakes of fact… [and] a party is not automatically entitled to relief simply because that party acted under a mistake of law." Gimbel Bros., 118 A.D.2d at 535.  Rather, the legislature's purpose was to "remove[] technical objections in instances where recoveries can otherwise be justified by analogy with mistakes of fact." Mercury Mach. Importing Corp. v. City of N.Y., 3 N.Y.2d 418, 427 (N.Y. 1957) (discussing section 112-f of the New York Civil Practice Act, the predecessor to CPLR 3005).

At least one New York trial court has recognized that recovery of payments made under a mistake of law is most appropriate where a party made affirmative misrepresentations concerning the law and that "resort to CPLR 3005 may be misplaced" in other circumstances. Gonzalez v. Green, 831 N.Y.S.2d 856, 861 (Sup. Ct. N.Y. Cnty. 2006); see also Jossel v. Meyers, 212 A.D.2d 55, 57 (App. Div. 1st Dep't 1995) ("It is no accident that much of the case law on CPLR 3005 . . . involve examples of its non-application.").

ii.  **The Voluntary Payment Applies to Both Statutory and Common Law Claims**

Plaintiff argues that the voluntary payment doctrine does not apply to any "statutory claims since those claims are premised on policy decisions of the legislature." (Pl's. Br. 8.)  Alternatively, plaintiff appears, at times, to advance the narrower argument that "claims under GBL [§] 349 are not subject to [the] voluntary payment defense." (Id.)  Whichever argument plaintiff intended, the Court disagrees and finds that, in the proper circumstances, the voluntary payment doctrine can bar both statutory and common law claims.

There is significant case law applying the voluntary payment doctrine to statutory claims,

including claims brought under GBL § 349.  See, e.g., DRMAK Realty LLC et al. v. Progressive Credit Union, 133 A.D.3d 401 (App. Div. 1st Dep't 2015) (affirming dismissal of GBL § 349 claims under the voluntary payment doctrine); Westfall v. Chase Lincoln First Bank, N.A., 258 A.D.2d 299 (App. Div. 1st Dep't 1999) (same); Morales v. Copy Right, Inc., 28 A.D.3d 440 (App. Div. 1st Dep't 2006) (applying the voluntary payment doctrine to bar recovery of payments allegedly collected in violation of CPLR 8001(c)); cf. Vaccariello v. XM Satellite Radio, Inc., 295 F.R.D. 62 (S.D.N.Y. 2013) (declining to certify a class due to recognition that the voluntary payment doctrine may bar GBL § 349 claims by certain class members); Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57 (S.D.N.Y. 2006) (same); Solomon v. Bell Atl. Corp., 9 A.D.3d 49 (App. Div. 1st Dep't 2004) (same).

In support of her argument to the contrary, Wurtz relies on three Second Department cases that considered the doctrine but ultimately allowed plaintiff to recover fees allegedly charged in violation of New York Real Property Law ("RPL") § 274-a(2) and GBL § 349.  See MacDonnell v. PHH Mtge. Corp., 45 A.D.3d 537 (App. Div. 2d Dep't 2007); Dowd v. Alliance Mortg. Co. 32 A.D.3d 894 (App. Div. 2d Dep't 2006); Dougherty v. North Fork Bank, 301 A.D.2d 491 (App. Div. 2d Dep't 2003).  Each of these cases relies on Negrin v. Norwest Mortg. Inc., a case in which the Second Department allowed the plaintiff to recover fees allegedly collected in violation of RPL § 274-a(2) based on a finding that the "plaintiff was at [defendant's] mercy" and "had no choice but to pay the" fee.  263 A.D.2d 39, 50 (App. Div. 2d Dep't 1999).

The holdings in MacDonnel, Dowd, and Dougherty are consistent with the general rule that payments are not voluntary where made under duress.  For that reason, these cases do not support plaintiff's argument.  MacDonnel, Dowd, and Dougherty each concern a property owner who desired to sell a piece of property that was subject to a mortgage.  Each owner was required

to provide a "payoff statement" in order to complete the sale and, in each case, the mortgagee charged fees for providing the "payoff statement" in violation of RPL § 274-a(2), which specifically prohibits such fees. In light of the "disparity of bargaining power" between the parties in that circumstance, the "only sane thing to do was to pay the charges rather than jeopardize the closing and the sale." Negrin, 263 A.D.2d at 50. As such, the voluntary payment doctrine did not bar recovery. Id.

At most, this line of cases stands for the proposition that claims for recovery of payments made in violation of RPL § 274-a—a statute that is not at issue here—are not barred by the voluntary payment doctrine. See MacDonnell, 45 A.D.3d at 539 (these rulings "are based upon a judicial construction of Real Property Law § 274-a, not the statutory language itself" and "are sui generis to cases alleging a violation of Real Property Law § 274-a") (Goldstein, J., concurring). In this Court's view, however, a better reading of these cases is as a straightforward application of the rule that a payment is not voluntary when made under duress. In any event, the cases provide *no* support for plaintiff's position that statutory claims are exempt from the voluntary payment doctrine. Similarly, they do not support plaintiff's narrower position that GBL § 349 claims are exempt.

Plaintiff also claims that, in Spiro v. Healthport Techs., LLC, 73 F. Supp. 3d 259 (S.D.N.Y. 2014), a federal district court held that "claims under GBL 349 are not subject to [the] voluntary payment defense." (Pl's. Br. 8.) [6] Plaintiff, however, misstates Spiro's holding; the court found that the voluntary payment doctrine did not bar a claim under GBL § 349 "where defendants allegedly failed to disclose" material facts because such payment had been made under a mistake

---

[6] Plaintiff does not seem to offer Spiro in support of her (much broader) contention that *all* statutory claims are exempt from the voluntary payment doctrine. For the avoidance of doubt, the Court finds that Spiro does not support that position.

of fact. Spiro, 73 F. Supp. 3d at 275. As such, Spiro is a straightforward application of the voluntary payment doctrine.

In a parenthetical that is clearly dicta, however, the Spiro court *does* cite MacDonnell for the proposition that "'the voluntary payment doctrine will not bar' causes of action under General Business Law § 349(a)." Id. (quoting MacDonnell, 45 A.D.3d at 539). The full sentence from MacDonnell is as follows: "This Court has determined that the voluntary payment doctrine will not bar *such* statutory causes of action." MacDonnell, 45 A.D.3d at 539 (emphasis added).

In the Court's view, the Spiro court's omission of the critical word "such" in the above-quoted sentence distorts MacDonnell's holding. The MacDonnell court considered a claim for the recovery of payments made in an inherently coercive situation and noted that "such" claims were not barred by the voluntary payment doctrine because they were not truly voluntary. MacDonnell held neither that the voluntary payment doctrine is inapplicable to statutory claims nor that GBL § 349 claims are uniquely immune to the doctrine.

In a last-ditch effort, plaintiff cites to a string of courts in other jurisdictions that purportedly hold that the voluntary payment doctrine "does not apply to statutory claims on policy grounds." (Pl's. Br. 9-10.) These cases are inapposite for a number of reasons, not least of which is that the voluntary payment doctrine at issue here arises from New York common law and, therefore, is not necessarily identical to similar doctrines elsewhere. Cf. Helms v. Consumerinfo.com, Inc., 236 F.R.D. 561, 565 (N.D. Ala. 2005) (describing the Alabama voluntary payment doctrine as "a creature of Alabama state law" that—unlike the New York doctrine—appears to apply only to claims of unjust enrichment).

More to the point, however, none of plaintiff's cited cases support her argument. Indeed, one case relied on by plaintiff explicitly holds that the voluntary payment doctrine can bar a claim

for recovery of payment "whether that claim is premised on a contractual relationship or a statutory obligation." Ramirez v. Smart Corp., 863 N.E.2d 800, 810 (Ill. App. Ct. 2007). Further, other cases found that the doctrine did not apply because the payment was not voluntary, rather than because of any rule barring application to any statutory claim. See, e.g., In re Peschel, 4 N.W.2d 194 (N.D. 1942) (finding that the payment was not voluntary when made under duress); Brown v. SBC Commc'ns, Inc., No. 05-cv-777, 2007 U.S. Dist. LEXIS 14790, *27 (S.D. Ill. Mar. 1, 2007) (declining to apply the voluntary payment doctrine at the pleading stage when the plaintiff "allege[d] that the payments at issue were not voluntary at all and instead were procured through fraud"). Other cases indicate that the application of the doctrine to statutory claims is "a statute-specific inquiry" and do not support wholesale exemption for statutory claims. See MBS-Certified Pub. Accountants, LLC v. Wis. Bell, Inc., 809 N.W.2d 857, 872 (Wis. 2012); see also Eisel v. Midwest BankCentre, 230 S.W.3d 335, 339 (Mo. 2007) (the "voluntary payment doctrine is a principle based on waiver and consent" and is inapplicable to statutory claims that are "not subject to waiver, consent or lack of objection"); Huch v. Charter Commc'ns, Inc., 290 S.W.3d 721 (Mo. 2009) (same); Sobel v. Hertz Corp., 698 F. Supp. 2d 1218 (D. Nev. 2010) (same). Finally, even the cases most supportive of plaintiff's position hold only that the voluntary payment doctrine does not apply to statutes that affirmatively set out a defined public policy; no case rules that *all* statutory claims are immune. See, e.g., Jackson v. Novastar Mortgage, Inc., 645 F. Supp. 2d 636, 647 (W.D. Tenn. 2007) (the doctrine does not bar a claim alleging "a violation of the statutorily defined public policy against racial discrimination").

In short, it is likely that the New York Court of Appeals would find that the voluntary payment doctrine bars recovery of payments made voluntarily and with full knowledge of the facts, regardless of whether such recovery is sought via a statutory or common law claim. As such, the

14

Court applies that rule here and need not reach plaintiff's argument that her unjust enrichment claim is, in reality, an implied private right of action under GOL § 5-335 because the doctrine would apply in the same manner in either circumstance.

### iii. The Voluntary Payment Doctrine Bars Plaintiff's Claims for Monetary Relief

Plaintiff's claims for recovery under GBL § 349 and under a theory of unjust enrichment rely on the same set of underlying facts, so the inquiry into whether the voluntary payment doctrine bars recovery is precisely the same for each claim.

The facts surrounding plaintiff's payment of $1,316.87 to Oxford Health establish that plaintiff made her payment voluntarily and with full knowledge of the relevant facts. At the time that she made her payment, plaintiff was aware that New York law was in conflict with ERISA concerning defendants' ability to collect this claim. (Wurtz Dep. 69:4-10; 83:17-22.)  Further, plaintiff was aware that there were "differing legal viewpoints" about whether defendants' claim for reimbursement was governed by New York law or ERISA and that, at the time of payment, there were "no reported cases" considering whether ERISA preempted New York law on this issue. (Id; Rabinovitz Dec. Ex. 6.)   Indeed, it appears that the very reason that plaintiff was aware that the law was "unclear" was because defendants' communications made her aware of this situation. Plaintiff was represented by competent counsel for the entire relevant time period and discussed defendants' demands with her counsel—including the fact that the governing law was unclear— and  all of defendants' relevant communications with plaintiff were transmitted through her attorneys (Wurtz Dep. 49:18-22; 54:12-55:7; 80:16-19).

Plaintiff advances two separate arguments opposing the application of the voluntary payment doctrine.  First, plaintiff argues that her payment was made under a mistake of law. Second, plaintiff argues that she made the payment under duress because she was concerned about

her credit score.  Both arguments are unavailing.

### a.  Plaintiff Did Not Operate Under a Mistake of Law

Plaintiff argues that defendants misrepresented the law and that, as a result, she made her payment under a mistake of law.  Where mistake of law is the result of a defendant's misrepresentation, such mistake may be analogous to a mistake of fact and, therefore, may justify recovery of such payment pursuant to CPLR 3005.  See, e.g., Gonzalez v. Green, 831 N.Y.S.2d 856, 861 (Sup. Ct. N.Y. Cnty. 2006); Connors, Practice Commentary, McKinney's Cons. Laws of N.Y., C.P.L.R. 3005.

Here, however, the facts laid out in section I.A and summarized in section II.C.iii, above, are such that no reasonable jury could find either that defendants misrepresented the law or that plaintiff made her payment under a mistake of law.  In fact, there is no indication either that plaintiff was misled by any of defendants' statements or that plaintiff operated under a mistake of law.  As plaintiff testified in her deposition, she was aware of the legal uncertainties surrounding defendants' requested payment and the record suggests that she had concluded that defendants' requests were improper prior to making her payment.

Indeed, the Second Circuit ultimately agreed with plaintiff's proposed resolution of the conflict between New York law and ERISA, leaving plaintiff in the odd position of correctly predicting the evolution of the law but still claiming that she operated under mistake of law.  This is insufficient to overcome the application of the voluntary payment doctrine.  See Dillon, 292 A.D.2d at 28 ("When a party intends to resort to litigation in order to resist paying an unjust demand, that party should take its position at the time of the demand, and litigate the issue before, rather than after, payment is made.").

### b.  **Plaintiff Did Not Pay Under Duress**

In her moving papers, plaintiff offers no argument that the voluntary payment doctrine should not apply to her because she operated under duress as a result of her concerns about her credit score.  The only mention of such concerns in her brief was a statement—made in response to defendants' "unclean hands" argument—that plaintiff "paid Defendants to avoid having bill collectors chase her and to protect her good credit."  (Pl's. Br. 24.)

On April 4, 2016, plaintiff's counsel filed a letter to the Court, arguing for the first time that, because plaintiff made the payment out of "fear of negative credit consequences," the payment was made under duress.  (Dkt. 96.)  This contention appears to be premised on plaintiff's testimony that she "didn't want any debt agents, any credit agents chasing me" and that she wanted "clean credit."  (Wurtz Dep. 54:6-8; 55:14.)

In order for plaintiff's payment to have been made under duress, it must have been motivated by "some actual or threatened exercise of power possessed" by defendants such that plaintiff is forced to choose "the lesser of two evils."   People v. Dioguardi, 8 N.Y.2d 260, 276 (N.Y. 1960); cf. Negrin, 263 A.D.2d at 50 (finding that the voluntary payment doctrine did not apply where "the only sane thing to do" was to make the payment); Sitar v. Sitar, 61 A.D.3d 739, 742 (App. Div. 2d Dep't 2009) ("A contract may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will.").  No reasonable jury could find that this situation meets that standard.

Plaintiff testified that defendants never threatened her.  (Wurtz Dep. 67:2-17.)  In particular, plaintiff testified that defendants did not threaten to report her to credit agencies and did not

threaten to take away her insurance and, indeed, defendants' only actions were to send letters to plaintiff's attorneys.  (Id. at 67:16-19; see also Rabinovitz Dec. ex. 6.)  In short, there is no evidence that plaintiff's payment was induced by any actual or threatened exercise of power by defendants.[7]

In support of her duress argument, plaintiff relies on Roche, et al.v. Aetna, Inc. et al, an unreported case in the District of New Jersey that was decided after plaintiff briefed her argument in this case.  No. 12-cv-1377 (D.N.J. Mar. 1, 2016).  Plaintiff argues that Roche supports her position that a plaintiff's professed fears concerning her credit score constitute duress sufficient to overcome application of the voluntary payment doctrine.

The plaintiff in Roche argued that the New Jersey voluntary payment doctrine did not bar recovery of a payment motivated by plaintiff's fears that, if he failed to pay, he would lose insurance coverage and his credit score would suffer.  In concluding that the voluntary payment doctrine did not apply, the Roche court relied *only* on the plaintiff's professed fear about loss of insurance coverage and did not base its decision on plaintiff's credit fears.  Id. at 25 (finding there to be "sufficient evidence to prove that [plaintiff] had a real fear of loss of coverage").  Here, Wurtz had no fear of loss of coverage because she terminated her insurance with defendants in August 2011, prior to making the contested payment.  (Wurtz Dep. 32:9-18.)  Thus, the determinative fact in Roche is absent.  Further, plaintiff has cited no New York law recognizing that a party's subjective fear related to her credit score, without more, can constitute duress.

For the reasons stated above, the voluntary payment doctrine bars plaintiff's recovery of her payment.  Defendants' motion for summary judgment on plaintiff's claims for monetary relief

---

[7] To the extent that plaintiff's payment was motivated by her subjective fears that failing to make the requested payment would impact her credit score, an appropriate course of action might have been to make payment under protest.  See, e.g., Dillon v. U-A Columbia Cablevision of Westchester, Inc., 292 A.D.2d 25, 27 (App. Div. 2d Dep't 2002) (noting that the voluntary payment doctrine bars recovery for payments made "voluntarily, without protest"); Gimbel Bros. v. Brook Shopping Centers, Inc., 118 A.D.2d 532, 534 (App. Div. 2d Dep't 1986) (same).

is granted.

**D.  New York General Business Law § 349(a)**

Defendants also argue, in the alternative, that they are entitled to summary judgment on plaintiff's GBL § 349 claim because their representations were not deceptive or misleading and caused no injury to plaintiff.  The Court finds that defendants' representations were neither deceptive nor misleading and, therefore, defendants are entitled to summary judgment on plaintiff's GBL § 349 claim on that alternative ground.  The court does not reach the question whether defendants' statements caused plaintiff's injury.

### i.  **Elements of a Claim Under General Business Law § 349(a)**

Section 349(a) of New York's General Business Law states that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  There are three elements of a claim for violation of § 349: (1) the act or practice at issue must be consumer-oriented; (2) the act or practice at issue must be misleading in a material respect; and (3) the plaintiff must be injured as a result of the act or practice at issue.  See, e.g., Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009); Rodriguez v. It's Just Lunch, Intern., 300 F.R.D. 125, 145 (S.D.N.Y 2014); Spiro v. Healthport Techs., LLC, 73 F. Supp. 3d 259, 275 (S.D.N.Y. 2014).  Because the Court finds that defendants' actions were not misleading, the Court needs not discuss the first and third elements.

The New York Court of Appeals has adopted an objective definition of "misleading," under which the alleged act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."  Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (N.Y. 1995); see also Orlander v. Staples, 802 F.3d 289, 300 (2d Cir. 2015); Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007).   New York courts

applying this standard have made clear that the relevant circumstances to be considered are "the plaintiff's circumstances." Solomon v. Bell Atl. Corp., 9 A.D.3d 49, 52 (App. Div. 1st Dep't 2004); Brissenden v. Time Warner Cable of N.Y. City, 25 Misc. 3d 1084, 1089 (Sup. Ct. N.Y. Cnty. 2009).

Although "New York courts have held that collecting fees in violation of other federal or state laws may satisfy the misleading element of § 349," Cohen, 498 F.3d at 126, such holdings have been in situations where the fees were patently illegal at the time of collection. See, e.g., Negrin, 263 A.D.2d 39 (holding that a demand of fees for the provision of a "payoff statement" in violation of RPL § 274-a(2) was misleading); Bartolomeo v. Runco, 162 Misc. 2d 485, 490 (Yonkers City Ct. 1994) (holding that a representation that an illegal cellar apartment was a legal dwelling, and collecting rent from tenant, was misleading). Where there is ambiguity as to the legality of fees at the time of collection, however, statements regarding those fees are not necessarily misleading. See, e.g., Lum v. New Century Mortgage Corp., 19 A.D.3d 558, 559 (App. Div. 2d Dep't 2005) (finding no misleading statement under GBL § 349 where premiums to be collected from plaintiff were disclosed and were not "per se illegal").

**ii.  Defendants' Statements Were Not Misleading**

The record establishes that no reasonable jury could find that defendants' statements concerning their claim for reimbursement were misleading or deceptive. Defendants not only informed plaintiff of the legal ambiguity surrounding their claim, they explicitly noted that there were no cases directly on point and then laid out a reasoned argument in support of their position. That the Second Circuit ultimately disagreed with defendants does not retroactively render their statements misleading or deceptive.

Further, whether defendants' statements were misleading must be considered in the context of plaintiff's situation, which includes the fact that she was represented by sophisticated counsel at all relevant times. All communications came through plaintiff's counsel, and counsel explained the legal issues to plaintiff. Although the involvement of counsel is not determinative, it serves as further support that no reasonable jury could find defendants' conduct to be misleading.

In short, defendants' statements were unlikely to mislead a reasonable consumer acting reasonably under these circumstances. Defendants are entitled to summary judgment on plaintiff's GBL § 349 claim because defendants' statements were neither misleading nor deceptive. The Court does not reach defendants' arguments concerning whether their statements were sufficient to satisfy the injury requirement under GBL § 349.

### E.  **Defendants' Unclean Hands Argument**

Because plaintiff's claim for unjust enrichment is barred by the voluntary payment doctrine, the Court does not reach defendants' alternative argument that that claim is barred by the equitable defense of unclean hands.

### III.    CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted and plaintiff's cross-motion for partial summary judgment is denied.

**SO ORDERED.**

Date: November 17, 2016
Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge

21